******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

# STATE OF CONNECTICUT *v.* DWAYNE SAYLES
## (SC 20575)

Robinson, C. J., and McDonald, D'Auria, Mullins and Ecker, Js.

*Syllabus*

Convicted of felony murder and conspiracy to commit robbery in the first degree, among other crimes, in connection with his role in the robbery of a convenience store and the shooting death of the store clerk, the defendant appealed to the Appellate Court, claiming, inter alia, that the trial court had improperly denied his motions to suppress evidence of his cell phone and the data contained therein. The defendant and two other men, V and S, had driven to the convenience store in V's car. While V waited in the car, the defendant and S entered the store, robbed it of cash and cigars, and fatally shot the store clerk. V then drove S and the defendant to the defendant's apartment. V later contacted the police and identified the defendant and S in photographs taken from the store's surveillance footage, which showed that they were wearing masks and gloves. Subsequently, the police obtained and executed a search warrant for the defendant's residence, where they found a ski mask and a pair of gloves. The defendant was not present during the search but thereafter met with the police for an interview. Before the interview, the defendant gave his cell phone to his mother, who was sitting outside of the interview room. After the defendant invoked his right to counsel, a detective approached the defendant's mother and asked her for the defendant's cell phone, which she gave to the detective. The police subsequently obtained a warrant to search the contents of the cell phone. The evidence retrieved from the cell phone included a draft, unsent text message to an unknown recipient, in which the defendant stated, "[i]f I get locked up tell sheema put them shits in the river some where . . . ." At trial, there was testimony that "sheema" referred to the defendant's girlfriend, and the prosecutor argued during closing argument that "shits" referred to the gun used during the robbery. The state also elicited testimony from H, who had been incarcerated with the defendant during the defendant's pretrial custody. H testified that the defendant admitted that he and S both had shot the clerk during the robbery. The state further introduced into evidence a statement made to the police by J, a friend of the defendant who had been arrested for an unrelated crime. In that statement, J indicated that he had spoken to the defendant and S on the day of the robbery and that they had admitted to having shot the clerk. The Appellate Court upheld the judgment of conviction. In doing so, the Appellate Court rejected the defendant's claims that the police had violated his rights under *Miranda* v. *Arizona* (384 U.S. 436) and article first, § 8, of the Connecticut constitution when they continued to interrogate him after he had invoked his right to counsel, that the seizure of his cell phone violated the fourth amendment to the United States constitution and article first, § 7, of the Connecticut constitution, and that the affidavit the police submitted in support of their application for a warrant to search the contents of his cell phone contained materially false information. On the granting of certification, the defendant appealed to this court, claiming, inter alia, that the Appellate Court had improperly upheld the defendant's conviction and that article first, § 8, of the Connecticut constitution mandates protection of a suspect's rights under *Miranda* via the adoption of a rule that evidence obtained through the questioning of a suspect after the suspect has invoked the right to counsel must be suppressed and cannot be used in the state's case-in-chief at a subsequent trial.

*Held* that any error in the admission of the contents of the defendant's cell phone was harmless beyond a reasonable doubt, and, accordingly, this court declined to address the defendant's constitutional challenges and affirmed the Appellate Court's judgment:

A review of the trial record demonstrated that the state offered an overwhelming wealth of evidence beyond the contents of the cell phone to prove that the defendant had committed the crimes with which he

was charged, including surveillance footage from inside of the convenience store, which depicted two perpetrators wearing hoodies, ski masks, and gloves, and the detailed testimony from V about his and the defendant's involvement in the events that occurred on the night of the robbery, and the consistency and independent corroboration of the various witnesses' testimony and statements rendered any error with respect to the admission of the contents of the cell phone harmless beyond a reasonable doubt.

Specifically, V's detailed testimony was corroborated by H's testimony that the defendant had admitted to the robbery and had provided him with numerous details about it, including that the defendant and another man both had guns and both had shot the clerk, that he wanted to get his cell phone excluded from evidence because it contained a photograph of the gun used in the robbery, that he was worried that the ski mask and gloves discovered by the police might have his DNA on them, and that he hid the gun at his girlfriend's house after the shooting but moved it once the police searched his residence, and V's testimony was also corroborated by J's statement to the police, which included details about the robbery that were not publicly available, such as the type of gun S used and the brand of cigars they stole.

Moreover, the state presented significant evidence of the defendant's consciousness of guilt, insofar as there was testimony from H that, after J gave his statement to the police, the defendant directed his cousin to assault J to force J to recant his testimony, and testimony from J himself that, after speaking to the police, he had a physical altercation with someone who had the same name as the defendant's cousin.

Furthermore, there was physical evidence corroborating the testimony and statements of V, H, and J, including the ski mask and gloves found during the search of the defendant's residence, testimony that an analysis of the DNA discovered on that ski mask indicated that the defendant was a potential contributor to that DNA, and testimony about the historical cell site location data associated with the defendant's cell phone, which established that that phone was in the areas of the convenience store and the defendant's residence at around the same times that, according to V's testimony, V, the defendant, and S were at those locations.

Although this court acknowledged that the testimony of V and H was properly viewed with some skepticism in light of their self-interest in testifying for the state as an accomplice and a jailhouse informant, respectively, the quality of their testimony grew in strength with the degree of independent corroboration.

In addition, even though the prosecutor mentioned the unsent text message several times during closing and rebuttal arguments, when viewed in context, the prosecutor's focus on the unsent text message was minimal relative to the other evidence admitted at trial, insofar as the prosecutor addressed the testimony of the various witnesses and the cell site location data before mentioning the contents of the cell phone and emphasized that other evidence far more strongly, and the contents of the cell phone played no role in establishing an element of an offense or in bolstering or destroying the credibility of any particular witness, which lessened the impact of any improper admission of the cell phone's contents.

(*One justice dissenting*)

Argued October 11, 2022—officially released March 26, 2024

*Procedural History*

Substitute information charging the defendant with the crimes of felony murder, conspiracy to commit robbery in the first degree, criminal possession of a pistol or revolver and carrying a pistol without a permit, brought to the Superior Court in the judicial district of New Haven and tried to the jury before *B. Fischer, J.*; verdict and judgment of guilty, from which the defendant appealed to the Appellate Court, *Elgo, Alexander* and *Suarez, Js.*, which affirmed the trial court's judgment, and the defendant, on the granting of certifica-

tion, appealed to this court. *Affirmed.*

*Dina S. Fisher*, assigned counsel, for the appellant (defendant).

*Timothy J. Sugrue*, assistant state's attorney, with whom were *Lisa M. D'Angelo*, executive assistant state's attorney, and, on the brief, *John P. Doyle*, *Jr.*, state's attorney, *Patrick J. Griffin*, former state's attorney, *Seth R. Garbarsky*, supervisory assistant state's attorney, and *Rocco A. Chiarenza*, senior assistant state's attorney, for the appellee (state).

*Opinion*

ROBINSON, C. J. A jury found the defendant, Dwayne Sayles, guilty of felony murder in violation of General Statutes § 53a-54c, among other offenses, in connection with his role in the robbery of a New Haven convenience store that resulted in the fatal shooting of the store clerk. The defendant now appeals, upon our grant of his petition for certification,[1] from the judgment of the Appellate Court affirming the judgment of conviction. *State* v. *Sayles*, 202 Conn. App. 736, 769, 246 A.3d 1010 (2021). On appeal, the defendant raises numerous constitutional challenges to the decision of the Appellate Court upholding the trial court's denial of his motions to suppress evidence of his cell phone and its stored data. We, however, need not address the merits of the defendant's various constitutional claims because we conclude that any error in the admission of the contents of the defendant's cell phone was harmless beyond a reasonable doubt. Accordingly, we affirm the judgment of the Appellate Court.

The record reveals the following relevant facts and procedural history, much of which is aptly set forth in the opinion of the Appellate Court. "On April 6, 2015, Leighton Vanderberg drove around in his wife's Ford Focus with the defendant and Jamal Sumler. The three men proceeded to the Fair Haven section of New Haven and then toward Forbes Avenue. Sumler requested that they stop at a store. Vanderberg complied, drove to [the Pay Rite Food Store (Pay Rite)] convenience store and parked on the street. Vanderberg asked Sumler to purchase a couple of cigars and provided him with cash to complete the transaction. The defendant and Sumler went into the convenience store while Vanderberg remained in the vehicle.

"Sumler, wearing a grey hooded sweatshirt, entered the convenience store first. As he approached the counter, he pointed a pistol at the victim, Sanjay Patel, an employee at the convenience store. As Sumler moved behind a counter, the defendant entered the convenience store. The defendant pulled out a pistol from his pocket and, after a few moments, shot the victim. The defendant was handed a box of cigars and some cash. He then moved toward the entrance of the convenience store. As Sumler and the victim, who brandished a stool, engaged in a physical altercation, the defendant fled. After the defendant departed, Sumler shot the victim." (Footnote omitted.) *State* v. *Sayles*, supra, 202 Conn. App. 739–40. The victim later died from his injuries, namely, gunshot wounds to the torso and extremities. Id., 740 and n.4.

The three men fled in the Ford Focus to the Church Street South housing complex, where the defendant lived in an apartment. Id., 740. The defendant threw an entire box of cigars and the sweatshirt he was wearing

into a nearby dumpster. Id. "After receiving approximately $20 for gas from the defendant and thirty to forty cigars from Sumler, Vanderberg left the apartment." Id., 741.

"The next night, Vanderberg learned from a friend that the victim had been shot and killed at the [Pay Rite]. Thereafter, he informed his probation officer about what had transpired . . . . Following his arrest, Vanderberg met with police detectives on April 14, 2015, and identified the defendant and Sumler in photographs that were taken from surveillance video at the [Pay Rite]." Id., 741. On April 15, 2015, the police executed a search warrant for the defendant's residence. Id., 744. During their search, the police discovered a black ski mask and a dark colored pair of gloves. Id., 744 and n.10.

The defendant was not present at the time of the search, but, when he learned about the search later that day, he contacted the police and agreed to meet for an interview with Detectives Chistopher Perrone and David Zaweski at a New Haven police station. Id., 744. At the start of the video-recorded interview, Perrone read the defendant his *Miranda*[2] rights. Id., 744–45 and n.11. Perrone subsequently took the defendant's cell phone from the defendant's mother, who was holding it for him during the interview.[3] Id., 742, 744–45. The defendant and his mother then left the police station. The next day, the court granted Perrone's application for a search and seizure warrant to obtain data contained in the defendant's cell phone. Id., 742.

Ultimately, the police retrieved from the defendant's cell phone (1) an incoming text message telling the defendant not to come home at approximately the same time that the police were searching his residence, (2) a news report about the Pay Rite robbery, which had been downloaded after the search of the defendant's home, (3) communications between the defendant, Sumler, and Vanderberg on the night of the Pay Rite robbery, and (4) a draft, unsent text message, stating, "[i]f I get locked up tell sheema put them shits in the river some where worda loc."[4]

"After further investigation, the police arrested the defendant. In May, 2015, while in pretrial custody, he admitted to a fellow inmate [Derrick Hoover] that he and Sumler had shot the victim during the robbery of the [Pay Rite]." *State* v. *Sayles*, supra, 202 Conn. App. 741.

The state charged the defendant with felony murder in violation of § 53a-54c, conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-48 and 53a-134 (a) (2), criminal possession of a pistol or revolver in violation of General Statutes § 53a-217c, and carrying a pistol without a permit in violation of General Statutes § 29-35 (a). Prior to trial, the defendant moved to suppress evidence of his cell phone and

its stored data. Following an evidentiary hearing, the trial court denied the defendant's motions to suppress, first orally and later in a supplemental memorandum of decision. The case was then tried before a jury, which found the defendant guilty on all counts. The trial court rendered judgment in accordance with the jury's verdict and imposed a total effective sentence of eighty years of incarceration.

The defendant appealed from the judgment of conviction to the Appellate Court, claiming that "(1) [the] police detectives [had] violated his *Miranda* rights and his rights pursuant to article first, § 8, of the Connecticut constitution when they continued to interrogate him after he invoked his right to counsel, (2) the police detectives [had] seized his cell phone in violation of the fourth amendment to the United States constitution and article first, § 7, of the Connecticut constitution, and (3) the affidavit that the police [had] submitted in support of their application for a warrant to search the contents of his cell phone contained materially false information." (Footnote omitted.) *State* v. *Sayles*, supra, 202 Conn. App. 738–39. The Appellate Court rejected these claims, following this court's decision in *State* v. *Mangual*, 311 Conn. 182, 85 A.3d 627 (2014), and concluded that, under federal case law following the United States Supreme Court's decision in *United States* v. *Patane*, 542 U.S. 630, 124 S. Ct. 2620, 159 L. Ed. 2d 667 (2004), a violation of *Miranda* constitutes a violation of only a prophylactic rule, and, thus, the fruits of the poisonous tree doctrine[5] did not require suppression of the contents of the defendant's cell phone. See *State* v. *Sayles*, supra, 739, 751–52; see also id., 748–50. As to the defendant's state constitutional claim seeking the adoption of a new prophylactic rule "to protect against police tactics aimed at undermining the constitutional rights of a suspect," the court held that the defendant had abandoned the claim because his appellate brief contained only a single sentence of analysis. Id., 753; see id., 753–55. The Appellate Court rejected the defendant's fourth amendment claim, reasoning that the seizure of the cell phone was supported by probable cause and was justified under the exigent circumstances doctrine. See id., 761–65. Finally, the Appellate Court concluded that the record and the defendant's brief were inadequate for review of the defendant's claim under *Franks* v. *Delaware*, 438 U.S. 154, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978), that the affidavit that the police submitted in support of their application for a warrant to search the contents of his cell phone contained materially false information by omitting the fact that he had requested an attorney. See *State* v. *Sayles*, supra, 767–79. Accordingly, the Appellate Court affirmed the judgment of conviction. Id., 769. This certified appeal followed. See footnote 1 of this opinion.

On appeal, the defendant claims that the Appellate Court improperly upheld the trial court's denial of his

motions to suppress evidence of his cell phone and the data stored therein for several reasons. Principally, however, the defendant provides a comprehensive analysis under *State* v. *Geisler*, 222 Conn. 672, 684–86, 610 A.2d 1225 (1992), and claims that article first, § 8, of the Connecticut constitution mandates protection of a suspect's *Miranda* rights via the adoption of a rule "that evidence obtained through questioning a suspect after the suspect has invoked the right to counsel [pursuant to *Edwards* v. *Arizona*, 451 U.S. 477, 484–85, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981)] must be suppressed and cannot be used in the state's case-in-chief [at] a subsequent trial."[6]

In response, the state contends that it is unnecessary to reach the constitutional issues raised by the defendant because any error in the admission of the cell phone and its stored data was harmless beyond a reasonable doubt, insofar as the "evidence of the contents of the [cell] phone was relatively minor and had no tendency to influence the judgment of the jury in view of the totality of the evidence . . . ."[7] The state's arguments are consistent with "the doctrine of constitutional avoidance," which this court often applies "not to decide difficult questions of constitutional law when the state has established that any constitutional error will not affect the result of the appeal because it is harmless beyond a reasonable doubt." *State* v. *Dickson*, 322 Conn. 410, 497, 141 A.3d 810 (2016) (*Robinson, J.*, concurring), cert. denied, 582 U.S. 922, 137 S. Ct. 2263, 198 L. Ed. 2d 713 (2017); see, e.g., *State* v. *Bowden*, 344 Conn. 266, 276, 278 A.3d 472 (2022) (declining to consider "[the] important issue" of whether seizure of defendant's cell phone was supported by sufficiently particular warrant because any error was harmless beyond reasonable doubt); *State* v. *Tony M.*, 332 Conn. 810, 821–22, 213 A.3d 1128 (2019) (declining to consider whether trial court properly found that defendant voluntarily waived his *Miranda* rights because any *Miranda* violation from admission of his statement would be harmless beyond reasonable doubt); *State* v. *Jordan*, 314 Conn. 89, 96–97, 100–101, 101 A.3d 179 (2014) (declining to decide whether closet was within defendant's control for purposes of search incident to arrest doctrine because any fourth amendment violation in admitting drugs found in closet was harmless beyond reasonable doubt).

Accordingly, before addressing the defendant's various constitutional claims, we turn to the state's harmless error arguments. The state contends that the importance of the cell phone data paled in comparison to Vanderberg's testimony, which was corroborated by independently obtained cell site location data—the legality of which is unchallenged[8]—establishing that the defendant's phone was in the vicinity of Howard Avenue, Pay Rite, and Church Street South, where the defendant's mother lived, before, during, and after the

robbery. The state emphasizes that additional corroboration of Vanderberg's account is provided by Hoover's testimony that the defendant had told him that his phone had " '[taken] a hit where the crime was,' " which he intended to address "by having his cousin take responsibility for the phone while it was in the vicinity of Pay Rite." The state argues further that Hoover's jailhouse informant testimony was "independently corroborated" with respect to "almost every important detail" and that Vanderberg's testimony was similarly corroborated by the video surveillance footage establishing "the approximate sizes of the robbers, the different lettering on their sweatshirts, the fact that they were both masked and gloved, and that they stole cigars in bluish wrappers." Finally, the state observes that "DNA consistent with that of the defendant and Sumler was found on the masks seized from their residences."

Focusing in particular on the unsent text message telling Baker to "put them shits in the river," which the state suggested referred to murder weapons, the defendant contends in response that the state cannot establish that any error was harmless beyond a reasonable doubt. The defendant argues that this evidence covered up numerous gaps in the state's case, which "rested on inferences from imprecise cell site location data and the testimony of dubious value from shady felons," and which suffered from "no eyewitnesses to the shooting, no evidence (aside from Vanderberg's self-serving testimony) placing the defendant definitively at the scene, no fingerprints or DNA linking the defendant to the shooting, no murder weapon, and no evidence after a search of his house or clothes that linked him to the shooting." In particular, the defendant observes that the prosecutor referred to the unsent text message four times during closing argument, which "demonstrates its importance" to the state's case. The defendant also argues that the "fact that a mask found in [his] home had his DNA on it . . . is meaningless. He owned it. There was no connection made between the mask and the shooting of the clerk." (Citation omitted.) Finally, the defendant argues that he had been "eliminated as a contributor to the DNA found on and in Vanderberg's car and the mask found in it," and that the police failed (1) "[to test] the gloves taken from the defendant's home for gunshot residue," (2) to "pull any footage from video cameras near the defendant's apartment to check Vanderberg's testimony about the dumpster," and (3) to locate "Vanderberg's sweatshirt" or analyze his DNA. We agree with the state, however, and conclude that the consistency and independent corroboration of the testimony of Vanderberg, Hoover, and a statement from Jeremiah Samuels, a friend of the defendant, render any error with respect to the admission of the unsent text message harmless beyond a reasonable doubt.

It is well established that "the test for determining

whether a constitutional [error] is harmless . . . is whether it appears beyond a reasonable doubt that the [error] complained of did not contribute to the verdict obtained. . . . If the evidence may have had a tendency to influence the judgment of the jury, it cannot be considered harmless. . . . That determination must be made in light of the entire record [including the strength of the state's case without the evidence admitted in error]. . . . Additional factors that we have considered in determining whether an error is harmless in a particular case include the importance of the challenged evidence to the prosecution's case, whether it is cumulative, the extent of cross-examination permitted, and the presence or absence of corroborating or contradicting evidence or testimony." (Internal quotation marks omitted.) *State* v. *Johnson*, 345 Conn. 174, 196, 283 A.3d 477 (2022). "In other words, we [must be] satisfied beyond a reasonable doubt that the result would be the same without the admission of the assumedly improper evidence." *State* v. *Jordan*, supra, 314 Conn. 104; see, e.g., *State* v. *Russaw*, 213 Conn. App. 311, 358, 278 A.3d 1, cert. denied, 345 Conn. 902, 282 A.3d 466 (2022). This inquiry is an objective one and requires us to consider the quality and quantity of both the inadmissible evidence and the admissible evidence that remains to support the verdict of the jury. See, e.g., *State* v. *Van Kirk*, 306 Mont. 215, 227–28, 32 P.3d 735 (2001); *State* v. *Boudreau*, 175 N.H. 806, 817, 305 A.3d 905 (2023); see also *State* v. *Bowden*, supra, 344 Conn. 276–77 ("we begin our analysis of harmlessness by placing the pieces of inadmissible evidence obtained from the defendant's cell phone in the context of the other evidence properly admitted at trial").

Our review of the trial record demonstrates that the state offered an overwhelming wealth of evidence beyond the unsent text message to prove that the defendant had committed felony murder and conspiracy to commit robbery in the first degree. To begin, surveillance camera footage from inside the Pay Rite on Forbes Avenue shows that a person entered the store holding a handgun in his right hand and wearing a gray hoodie with writing down the sleeves, a dark ski mask, and dark gloves. This person approached the counter and pointed a gun at the clerk. A second person then entered the store wearing a dark colored hoodie with light colored writing across the front, a dark ski mask, and dark gloves. The first person went behind the counter as the second person stood in front of it. The second person removed a handgun from his hoodie and fired it at the clerk, who is seen clutching his midsection. The first person handed what appears to be a handful of currency to the second person as the wounded clerk handed the second person what appears to be a cigar box. As the second person began to exit the store, the clerk swung a stool at the first person, who also shot the clerk before exiting the store.

Testifying for the state, Vanderberg, who drove the car used in the commission of the Pay Rite robbery, identified the two shooters in the surveillance video as the defendant and Sumler, and he described them both as being approximately five feet, seven inches tall. As to the events leading up to the robbery and shooting, Vanderberg testified that, on the day of the crime, he had been driving around New Haven in his wife's green Ford Focus when he received a call or FaceTime from either the defendant or Sumler, and they planned to meet and hang out. About fifteen minutes after the call, Vanderberg picked up the defendant and Sumler in his wife's vehicle on Dixwell Avenue in New Haven, and they drove around smoking marijuana. Vanderberg testified that he, the defendant, and Sumler never discussed committing a robbery. According to Vanderberg, at Sumler's request, he parked at "Eddy's" convenience store on Howard Avenue, where Sumler placed a gun in a cupholder and then exited the vehicle. The defendant took the gun from the cupholder. After a few minutes, Sumler returned to the vehicle with two pairs of black gloves, put on one pair, and gave the defendant the other. The defendant returned the gun to Sumler and asked Vanderberg for a sweatshirt. Vanderberg gave him a blue Nautica hoodie.

The three men then continued to drive around New Haven before stopping at the Pay Rite on Forbes Avenue. Vanderberg parked around the corner and asked the defendant and Sumler to get him some cigars. The defendant and Sumler exited the vehicle; both were wearing hoodies, and Sumler was holding his gun. A few minutes later, the defendant came back to the vehicle, walking fast while holding something in his hoodie and dropping cigars from his hands. Sumler then walked calmly back to the vehicle. Vanderberg drove the defendant and Sumler to the defendant's apartment complex, where the defendant threw a cigar box and Vanderberg's hoodie in a dumpster. Once inside the defendant's apartment, Sumler handed the defendant his gun, which the defendant placed in a storage area outside of his apartment. While talking at the apartment, the defendant told Vanderberg that his and Sumler's actions at Pay Rite were "some spur of the moment shit," from which Vanderberg inferred that they had robbed the convenience store. At that point, however, he did not know about the shooting. Vanderberg testified that, the day after the shooting, he learned that the clerk had been killed, and what happened "just wasn't sitting right with" him. Accordingly, he decided to inform his probation officer of what had happened and to arrange a meeting with law enforcement officers. He testified at trial pursuant to a plea agreement with the state.[9]

Vanderberg's detailed testimony was far from the only evidence linking the defendant to the crime.[10] Hoover, a jailhouse informant, testified that, for four or five

months, he was held in the same correctional facility as the defendant after the defendant's arrest for the Pay Rite robbery. According to Hoover, he and the defendant spoke almost every day during that time, and the defendant talked to him about the Pay Rite robbery three or four times per week. Specifically, the defendant told Hoover that he and another man had shot the clerk at the Pay Rite on Forbes Avenue. The defendant also told Hoover that he wanted to get his cell phone "thrown out" of evidence because it contained a photograph of the gun used in the robbery, that the police had discovered his ski mask and gloves at his residence, that he was worried that the ski mask and gloves might have his DNA on them, that he planned to testify that he had used the mask for dirt biking, that Vanderberg had remained in the vehicle during the robbery, that they shot the clerk because he "took too long," that both he and Sumler shot the clerk, that they both had guns, that they stole money and cigars, that, after the shooting, he hid the gun at his girlfriend's house but moved it after the police searched his residence, that his cell phone "took a hit" where the crime occurred, that he planned to testify that his cousin had his cell phone in that area, that, if he could get a low enough bond, he would run "down south," and that he wanted someone to call Vanderberg's wife to tell her that Vanderberg needed to recant. Hoover testified that he documented these conversations on a notepad in his cell so he could "help [his] situation."

Additional corroboration was provided by a statement by Samuels, which was admitted into evidence for substantive purposes under *State* v. *Whelan*, 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986).[11] Samuels had been arrested for another crime when, during an interview with the police, he provided information about the Pay Rite robbery, some of which was not publicly available. Specifically, Samuels told the police that he had spoken to Sumler and the defendant on the day of the Pay Rite robbery, and they told him that Sumler had a .357 caliber firearm, that Sumler and the defendant had both worn masks and had both shot the clerk, and that the proceeds of the robbery amounted to Dutch Masters brand cigars and some money. Samuels also told the police that he previously had known Sumler and the defendant to possess or have access to a semiautomatic handgun that he referred to as either a "deuce deuce" (.22 caliber) or a "deuce five" (.25 caliber). Samuels also informed the police that, after Vanderberg's arrest, the defendant told Samuels that Vanderberg could not inculpate him because Vanderberg had not been inside the store with him and Sumler during the robbery.

The state also offered evidence that, after Samuels spoke with the police, but before his incarceration on other charges, the defendant had his cousin, James

"Sucky" Douglas, assault Samuels to force him to recant his testimony. Specifically, Hoover testified that the defendant told him that he had Sucky beat up an individual identified as either "JS or JC" to get him to recant his statement to the police. Consistent with Hoover's testimony, Samuels testified that he had a physical altercation with someone named Sucky after he spoke to the police. The state offered into evidence a statement Samuels wrote after this physical altercation, in which he stated that he had provided the police with false information and that he wanted to recant. Samuels also wrote a letter to Sumler, stating that he could "make it right" by giving a statement that he had been "high" at the time of the interview and that he had provided the police with "bullshit." Indeed, at trial, Samuels testified that he had been under the influence of Xanax during the police interview, had lied to the police about the Pay Rite case, and wished to recant. This testimony set the foundation for the admission of a redacted version of his interview with the police under *Whelan*.

The record also contained physical evidence corroborating the testimony and statements of Vanderberg, Hoover and Samuels.[12] The state entered into evidence a black ski mask and a pair of black gloves, which the police had seized when they searched the defendant's home in the Church Street South housing complex. Additionally, Daniel Renstrom, a forensic science examiner with the state forensic science laboratory, testified that an analysis of the DNA discovered on the ski mask found inside the defendant's apartment indicated that the defendant was a potential contributor to that DNA, with the expected frequency of Black and white people as contributors to that sample being one in five. The defendant is a Black male.[13]

James J. Wines, a special agent for the Federal Bureau of Investigation, testified regarding the historical cell site location data associated with the defendant's cell phone. This data established that the cell phone was in the areas of Howard Avenue, the Pay Rite convenience store on Forbes Avenue where the victim was killed, and Church Street South at about the same times that Vanderberg testified that he, the defendant, and Sumler were at those locations. In particular, prior to the shooting, at both 7:11 and 7:15 p.m., the defendant's cell phone pinged the same cell tower, which covered the area of Howard Avenue. At 7:16 p.m., the defendant's phone pinged a different cell tower that covered an area that included the Pay Rite on Forbes Avenue. Wines testified that both cell towers pinged during this timeframe were in clear signal areas, meaning that the likelihood of the cell signal being redirected to another tower was minimal. Following the shooting, between 8:29 and 11:30 p.m., the defendant's cell phone pinged a third cell tower near his apartment eleven times. Wines conceded that he could not provide the exact location of the defendant's cell phone at any specific time. He also

acknowledged that a cell phone signal could move from one tower to another without the cell phone and user moving.

In addition to physical evidence, the state also offered the testimony of Jonathan Gavilanes. He testified that, at the time of the shooting, he was across the street from the Pay Rite at an auto repair shop. He heard the sound of a gunshot, looked out the shop window, and saw a man wearing a ski mask run out of the convenience store. He then heard a second gunshot and saw another man wearing a ski mask run out of the convenience store. Gavilanes testified that both men were wearing sweatshirts, and both were "[a]bout five feet, seven inches [tall], almost [Gavilanes'] height," which was six feet tall.

Having reviewed the record in this case, we are convinced that any impropriety in the admission of the cell phone and its stored data was harmless beyond a reasonable doubt. The defendant correctly observes that the testimony of Vanderberg and Hoover is properly viewed with some skepticism, given their obvious self-interest in testifying for the state as an accomplice and a jailhouse informant, respectively. See, e.g., *State* v. *Jones*, 337 Conn. 486, 501–503, 254 A.3d 239 (2020); *Birch* v. *Commissioner of Correction*, 334 Conn. 37, 65–66, 219 A.3d 353 (2019); *State* v. *Patterson*, 276 Conn. 452, 468–70, 886 A.2d 777 (2005). Nevertheless, what may be qualitatively weak evidence—especially standing alone—may grow in strength considerably when viewed in context. See, e.g., *State* v. *Maner*, 147 Conn. App. 761, 778, 780–81, 83 A.3d 1182 (in determining that claimed confrontation clause violation was harmless beyond reasonable doubt, court considered defendant's confession to jailhouse informant in combination with eyewitness testimony), cert. denied, 311 Conn. 935, 88 A.3d 550 (2014). The record demonstrates that the quality of the testimony of Hoover and Vanderberg grows by leaps and bounds with the degree of independent corroboration present in this case.

First, Vanderberg's testimony was corroborated by the video of the police interview, admitted under *Whelan*, in which Samuels stated that the defendant had also admitted to him his involvement in the robbery and shooting of the store clerk at the Pay Rite. Evidence that the defendant had his cousin use physical force to intimidate Samuels into recanting provides significant evidence of consciousness of guilt and also bolstered Samuels' previous statement to the police that the defendant had admitted his role in the robbery and the shooting to him. See *State* v. *Bowden*, supra, 344 Conn. 279–80 (impact of improper cell phone and text message evidence was heavily undercut by consciousness of guilt evidence, namely, witness tampering and destruction of evidence).

Second, Vanderberg's testimony was independently

corroborated by Hoover's testimony that the defendant admitted that (1) he had robbed the Pay Rite and shot the clerk, (2) his cell phone "took a hit" in the area of the crime, (3) he planned to testify that his cousin had his cell phone at the time of the crime, and (4) he was worried about his DNA being on the ski mask and gloves that the police had discovered at his residence. In addition to this level of detail, what makes the quality of Hoover's jailhouse informant testimony particularly compelling is that it contains information—not available to the public—that would not have been known to anyone except the perpetrators. See *State* v. *Jones*, supra, 337 Conn. 510 (in assessing credibility of informant, fact finder may consider, inter alia, "[t]he extent to which his testimony is confirmed by other evidence . . . [t]he specificity of the testimony . . . [and] [t]he extent to which the testimony contains details known only by the perpetrator" (internal quotation marks omitted)). That Hoover, who had no prior connection to the defendant or the crimes at issue, knew details about the crime that were not available to the public significantly bolstered his credibility and the qualitative strength of his testimony.

Finally, the most powerful evidence corroborating the testimony of Hoover and Vanderberg is cell site location data, the legality of which is unchallenged; see footnote 8 of this opinion; establishing that the defendant's phone was (1) in the area of Howard Avenue when he was picked up by Vanderberg, (2) in the area of the Pay Rite on Forbes Avenue at the approximate time of the robbery and shooting, and (3) in the area of Church Street South, where the defendant lived with his mother, just after the crime. Nevertheless, the defendant contends that the cell site location data are of minimal weight because "[t]he fact that [his] cell phone was in the vicinity of his . . . apartment, as well as Howard Avenue and the general area where the shooting occurred at around the same time as the shooting . . . is not dispositive; he lived there." (Citation omitted.) This argument oversimplifies the meaning of the evidence. As Wines explained, the cell site location data did not merely show that the defendant was in the vicinity of these three areas at the same time; it did not show that, at 7:16 p.m., the defendant's phone pinged a cell tower that covered all of Howard Avenue, the area of the shooting *and* his apartment. Rather, this evidence showed that the defendant was closest to the tower in the area of the shooting, and *not* the tower in the area of the apartment where he lived, at 7:16 p.m. Indeed, Wines testified that the cell towers in the area of the defendant's apartment and in the area of the shooting each had clear visibility, limiting the potential for the cell phone to have pinged cell towers further away from the cell phone's actual location. Although Wines conceded that the cell site location data could not precisely pinpoint the defendant's location, this

imprecision nevertheless was limited by the fact that the clear visibility at each cell tower meant that it was far more likely that the defendant's location was within the area of the pinged cell tower.

Beyond the cell site location data, still more evidence independently corroborated nearly every important detail of Vanderberg and Hoover's testimony, including the in-store surveillance footage, consistent with Gavilanes' eyewitness testimony, showing the suspects' height, and the presence of black gloves and a ski mask in the defendant's residence. See, e.g., *State* v. *Smith*, 344 Conn. 229, 262–63, 278 A.3d 481 (2022) (in determining harm, testimony of witness was bolstered by video footage). Nevertheless, the defendant argues that Gavilanes' eyewitness testimony did not bolster the testimony of Hoover or Vandenberg because Gavilanes testified that the two shooters were "almost [his] height," which was six feet tall, whereas the defendant was five feet, seven inches tall. This argument mischaracterizes Gavilanes' testimony. He testified that both suspects were "[a]bout five feet, seven inches [tall], *almost* [Gavilanes'] height," which was six feet tall, so Gavilanes testified that the suspects were "shorter" than him. (Emphasis added.) Similarly, the defendant argues that the in-store surveillance footage and Vanderberg's testimony conflicted because the footage did not show Vanderberg giving the defendant a sweatshirt from his truck *right before* the robbery, and, thus, neither corroborated the testimony of Hoover and Samuels. This argument again misunderstands the testimony. Vanderberg testified that he had given the defendant a sweatshirt from his trunk before the robbery but that he was not sure precisely when and where he did so. Specifically, he thought this occurred while the three men were "at Eddy's or somewhere in the Hill [section of New Haven]."

We also disagree with the defendant's argument that the lack of linchpin DNA evidence significantly undermines the state's harmless error claim in this case. The evidence showed that the defendant was one of the 20 percent of Black or white Americans who could have contributed DNA to the ski mask, the ski mask was discovered where the defendant lived, and the mask was similar in appearance to the ski mask worn by the suspects shown in the surveillance footage. Although the DNA evidence standing alone is far from definitive, considered in the context of the other properly admitted evidence, it nevertheless supports a nexus between the defendant and the shooting.

Finally, in assessing the potential impact of improperly admitted evidence on the jury's verdict, we consider the parties' closing arguments in order to assess its centrality to the factual issues in the case, with the degree of the parties' emphasis and reliance on the improperly admitted evidence indicative of its importance to the jury's verdict. See, e.g., *State* v. *Culbreath*,

340 Conn. 167, 195, 263 A.3d 350 (2021). We acknowledge that the prosecutor mentioned the draft text message retrieved from the defendant's cell phone—evidence that the defendant principally claims to have harmed him[14]—several times during closing and rebuttal arguments. Viewed in context, however, the prosecutor's focus on the unsent text message was minimal relative to the other evidence admitted at trial. Not only did the prosecutor address the testimony of Vanderberg and Hoover, the statement of Samuels, and Wines' testimony about the cell site location data before mentioning the contents of the cell phone, but the prosecutor emphasized that other evidence far more strongly.[15] After defense counsel's closing argument, in which counsel asserted the theory that Vanderberg had framed the defendant to mitigate his own culpability as the getaway driver for both the Pay Rite robbery and another fatal convenience store shooting in Bridgeport,[16] the prosecutor gave a rebuttal argument. In the rebuttal argument, the prosecutor addressed the various attacks on Vanderberg's credibility. The prosecutor again emphasized the importance of the cell site location data and urged the jury to credit the testimony of Hoover and the video of Samuels' police interview, both of which independently referred to statements by the defendant admitting his participation in the Pay Rite robbery and shooting. Only after discussing in detail the other physical evidence of the crime—the bullet fragments and the gloves and ski mask found in the defendant's residence—did the prosecutor again raise the topic of the unsent draft text message, arguing that it referred to throwing the gun used in the robbery into the river.[17] Thus, the contents of the defendant's cell phone played only a minor role in the prosecutor's closing and rebuttal arguments relative to the other evidence that more directly linked the defendant to the charged crimes. Additionally, the contents of the defendant's cell phone played no role in establishing an element of the offense, or bolstering or destroying the credibility of any particular witness, which lessens the impact of any improper admission into evidence.

Indeed, our case law establishes that a prosecutor's reliance on illegally obtained evidence in closing arguments —even evidence more directly incriminating than the text message at issue in this case—is not dispositive. See *State* v. *Tony M.*, supra, 332 Conn. 819, 823–25 and n.8 (any *Miranda* violation resulting from defendant's statement that tossing his infant son off bridge was akin to basketball " 'free throw' " was harmless beyond reasonable doubt as to element of intent, even though it was used to impeach his testimony at trial that drop was accidental, given "[the] overwhelming, independent evidence of the defendant's intent to kill his baby that the jury could have credited," including text messages sent to baby's mother on night of murder, statements to psychiatry resident at hospital, statements to

his mother and baby's mother on night of murder, and fact that statement was mentioned only briefly during summation); *State* v. *Jordan*, supra, 314 Conn. 103–105 (admission of ecstasy pills illegally seized from defendant's closet was harmless beyond reasonable doubt with respect to his intent to sell, despite prosecutor's heavy reliance on them in closing argument, given "[the] ample additional circumstantial evidence . . . that [he] intended to sell the thirty pills he possessed on his person at the time of his arrest," including testimony from multiple witnesses that they had seen defendant sell similarly marked ecstasy pills in several locations).

In sum, we conclude that the evidence against the defendant, viewed cumulatively and in context, was overwhelmingly strong and that the admission into evidence of the contents of the cell phone did not contribute to the jury's verdict. Vanderberg's narrative of the defendant's actions on the evening of the Pay Rite robbery was independently corroborated by the defendant's separate admissions of guilt to Hoover and Samuels, along with the cell site location data and the discovery of a ski mask and gloves at the defendant's residence. There was also consciousness of guilt evidence in the form of witness intimidation, insofar as Sucky assaulted Samuels in an attempt to keep him from testifying against the defendant, which Hoover testified occurred at the defendant's direction. These evidentiary underpinnings together convince us that any error in the admission of the contents of the defendant's cell phone was harmless beyond a reasonable doubt.

The judgment of the Appellate Court is affirmed.

In this opinion McDONALD, D'AURIA and MULLINS, Js., concurred.

[1] We granted the defendant's petition for certification to appeal, limited to the following issues: (1) "Did the Appellate Court properly uphold the trial court's denial of the defendant's motion to suppress the contents of his iPhone in reliance on *United States* v. *Patane*, 542 U.S. 630, 124 S. Ct. 2620, 159 L. Ed. 2d 667 (2004), and *State* v. *Mangual*, 311 Conn. 182, 85 A.3d 627 (2014), when the seizure of those contents was the result of questioning after he had invoked his *Miranda* rights, on the basis that a cell phone and its stored data constitute 'physical' (i.e., nontestimonial) evidence that need not be suppressed if seized as the result of a *Miranda* violation?" And (2) "[d]id the Appellate Court properly reject the defendant's claim that the holding in *Patane* does not comport with the broader protections against compelled self-incrimination afforded under article first, § 8, of the Connecticut constitution?" *State* v. *Sayles*, 336 Conn. 929, 247 A.3d 578 (2021).

The defendant initially did not seek certification to appeal from the portion of the Appellate Court's opinion rejecting his claims that (1) the seizure of his cell phone was not supported by the existence of probable cause and exigent circumstances, and (2) the affidavit supporting the application for a search warrant for his cell phone contained false information in violation of *Franks* v. *Delaware*, 438 U.S. 154, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978). See *State* v. *Sayles*, supra, 202 Conn. App. 755, 765. After we granted the defendant's petition for certification to appeal, we granted his subsequent motion for permission to file a supplemental brief raising those issues under the fourth amendment to the United States constitution.

[2] *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[3] Specifically, when the defendant first arrived at the police station, Perrone saw him holding his cell phone. *State* v. *Sayles*, supra, 202 Conn. App.

745. Although the detectives were not aware of this, before entering the interview room with them, the defendant had handed his cell phone to his mother, who was sitting on a nearby bench outside of that room. Id., 744. The defendant then asked to speak with an attorney. Id. Perrone briefly left the interview room, and, when he came back, he said to the defendant: "you have a cell phone . . . you had it out there. Who has your phone?" The defendant replied that his mother had the phone. Id., 742. Perrone again left the interview room, approached the defendant's mother, and asked if she had the defendant's cell phone. Id., 745. She responded affirmatively and handed it to Perrone. Id. Perrone then showed the cell phone to the defendant and asked if it was his, and the defendant confirmed that it was. Concerned about the potential loss of evidence through the erasure of data or loss of the device, Perrone took custody of the cell phone immediately, pending application for a search warrant. Id.

[4] Testimony at trial established that "sheema" referred to the defendant's girlfriend, Tysheema Barker.

[5] Upon the determination that a constitutional violation has occurred, the fruit of the poisonous tree doctrine requires the exclusion "not only [of] the illegally obtained evidence itself, but also . . . other incriminating evidence derived from the primary evidence." *Nix* v. *Williams*, 467 U.S. 431, 441, 104 S. Ct. 2501, 81 L. Ed. 2d 377 (1984).

[6] In addition to his state constitutional claim, which presents an issue of first impression, the defendant also contends that the Appellate Court improperly relied on the United States Supreme Court's decision in *United States* v. *Patane*, supra, 542 U.S. 630, in concluding that the fruit of the poisonous tree doctrine did not require suppression of the contents of the defendant's cell phone under the fifth amendment to the United States constitution. Specifically, he argues that this case did not involve a simple failure to give the *Miranda* warnings because, by continuing the interrogation, the detectives "deliberate[ly] flout[ed]" the defendant's invocation of his right to counsel under *Edwards* v. *Arizona*, supra, 451 U.S. 477. He also argues that evidence of the contents of a cell phone is not physical evidence but, instead, is testimonial evidence. As a corollary, the defendant contends that (1) the trial court made clearly erroneous factual findings concerning whether the defendant was free to leave the police station and whether the interview had ended when the police asked the defendant for his cell phone, and (2) the police interview was custodial in nature and triggered his protections under *Miranda*. Finally, the defendant argues that, under *Riley* v. *California*, 573 U.S. 373, 134 S. Ct. 2473, 189 L. Ed. 2d 430 (2014), and *State* v. *Smith*, 344 Conn. 229, 278 A.3d 481 (2022), the "all data" search warrant used to obtain the cell phone violated the fourth amendment to the United States constitution because it was not supported by probable cause and because it lacked sufficient particularity.

[7] As an additional, alternative ground to uphold the denial of the motion to suppress, the state also relies on the inevitable discovery and independent source doctrines to bar the application of the exclusionary rule in this case. Given our conclusion as to the state's harmless error claim, we need not address this alternative ground.

[8] The defendant does not challenge the legality of the cell site location data associated with his cell phone that was obtained via a search warrant issued to his cellular service provider. Nevertheless, the dissent argues that the cell site location data evidence is itself fruit of the poisonous tree that should have been excluded from evidence and, therefore, not considered in the harmless error analysis. See footnote 4 of the dissenting opinion. This analysis marks a departure from the adversarial process, pursuant to which claims are framed and raised by parties and then reviewed by the courts; see, e.g., *State* v. *Stephenson*, 337 Conn. 643, 653, 255 A.3d 865 (2020); insofar as the dissent raises a claim that the defendant himself has abandoned by not briefing. See, e.g., *Traylor* v. *State*, 332 Conn. 789, 805, 213 A.3d 467 (2019) ("[a]n unmentioned claim is, by definition, inadequately briefed, and one that is generally . . . considered abandoned" (internal quotation marks omitted)); *State* v. *O'Brien-Veader*, 318 Conn. 514, 562, 122 A.3d 555 (2015) (inadequately briefed claims are abandoned). Absent resort to the supplemental briefing procedure provided by *Blumberg Associates Worldwide, Inc.* v. *Brown & Brown of Connecticut, Inc.*, 311 Conn. 123, 161–62, 84 A.3d 840 (2014), for courts raising such claims sua sponte, we deem the legality of the cell site location data undisputed and afford it full consideration in conducting our harmless error analysis.

[9] Vanderberg acknowledged further that he had a history of criminal activity, including charges of felony murder in connection with the robbery of a Bridgeport convenience store a few days after the events at issue in the

present case. He also admitted that he had unspecified pending charges and had entered into a plea agreement with the state, pursuant to which he agreed to testify, although the state did not promise to recommend a specific sentence unless required to do so by the court.

[10] The dissent disagrees with our view that, for purposes of assessing harmless error, the value of the testimony of Vanderberg and Hoover, and the prior inconsistent statement of Samuels, is enhanced by the fact that this evidence independently corroborates each other. The dissent contends that it is "most likely" that the evidence from the defendant's cell phone persuaded the jury to believe their otherwise "inherently dubious" testimony. Part III of the dissenting opinion. The dissent then illustrates the suspect nature of testimony from accomplices or jailhouse informants by citing certain sister state cases for the proposition that some states will not even permit the testimony of accomplices or jailhouse informants to come into evidence without corroboration by a source other than another accomplice or jailhouse informant. See part III and footnote 7 of the dissenting opinion; see also, e.g., *State* v. *Harris*, 405 N.W.2d 224, 227 (Minn. 1987); *People* v. *Ohlstein*, 54 App. Div. 2d 109, 112, 387 N.Y.S.2d 860 (1976), aff'd, 44 N.Y.2d 896, 379 N.E.2d 222, 407 N.Y.S.2d 696 (1978); *Chapman* v. *State*, 470 S.W.2d 656, 660 (Tex. Crim. App. 1971); cf. *Schnidt* v. *State*, 357 S.W.3d 845, 851 (Tex. App. 2012) (standard for corroboration of accomplice and jailhouse informant testimony is same, and one cannot corroborate the testimony of the other), review denied, Texas Court of Criminal Appeals, Docket No. PD-0311-12 (April 18, 2012). The dissent "fail[s] to understand" how such witnesses' "powerful incentive . . . to implicate the defendant falsely in the crimes charged . . . is eliminated or even reduced by the fact that multiple witnesses all share the same motivation." Part III of the dissenting opinion.

We respectfully disagree with the dissent's reliance on this body of case law. First, as the dissent acknowledges, the accomplice corroboration rule is one of evidentiary sufficiency that is not required at common law and that has largely been implemented by statute in approximately one-half of the states, "requiring, in varying degrees, that the testimony of an alleged accomplice be corroborated by independent evidence, that is, evidence not dependent on an accomplice." *State* v. *Jones*, 466 Md. 142, 158, 216 A.3d 907 (2019). In overruling its common-law accomplice corroboration rule as arbitrary and an intrusion on the jury's constitutional role as fact finder; see id., 160–62; Maryland's highest court recently observed that "most jurisdictions (thirty-two states, the District of Columbia, the federal courts, Puerto Rico, Guam, and the Virgin Islands) either have not adopted the accomplice corroboration rule or have since repealed it," leaving Tennessee as "the only [jurisdiction] with a [judicially created] accomplice corroboration rule." Id., 160–61. Most significant, Connecticut does not have a common-law or statutory rule requiring the corroboration of accomplice or jailhouse informant testimony as a matter of law, with recent legislation addressing jailhouse informant testimony concerning disclosure; see General Statutes § 54-86*o*; and, in certain serious felony cases, more wholistic assessments of reliability beyond corroboration under General Statutes § 54-86p. See, e.g., *State* v. *Jones*, 337 Conn. 486, 505–506, 254 A.3d 239 (2020). Instead, in our view, the informant and accomplice testimony in this case is consistent with those indicators of reliability, including "(1) [t]he extent to which the jailhouse witness's testimony is confirmed by other evidence; (2) [t]he specificity of the testimony; (3) [t]he extent to which the testimony contains details known only by the perpetrator of the alleged offense; (4) [t]he extent to which the details of the testimony could be obtained from a source other than the defendant; and (5) [t]he circumstances under which the jailhouse witness initially provided information supporting such testimony to [the police] . . . or a prosecutorial official, including whether the jailhouse witness was responding to a leading question." General Statutes 54-86p (a); see, e.g., *State* v. *Jones*, supra, 506.

Second, even in states that have accomplice corroboration rules, it is by no means settled law that the testimony of a jailhouse informant cannot be used to corroborate that of an accomplice. Compare *People* v. *Huggins*, 235 Cal. App. 4th 715, 718–19, 185 Cal. Rptr. 3d 672 (2015) (concluding that statutes requiring corroboration of accomplice and jailhouse informant testimony do not preclude use of jailhouse informant testimony to corroborate accomplice testimony, and rejecting request "to impose a judicially created rule that accomplices and in-custody informants cannot corroborate each other's testimony because both are self-interested"), review denied, California Supreme Court, Docket No. S226350 (July 8, 2015), and *State* v. *Pippitt*,

645 N.W.2d 87, 94 (Minn. 2002) (rejecting argument that jailhouse informant was not credible as matter of law for purposes of corroborating accomplice testimony), with *Johnson* v. *State*, Docket No. 11-14-00311-CR, 2017 WL 3923665, *6–7 (Tex. App. August 31, 2017) (discussing split of authority on this point among intermediate appellate courts in Texas).

[11] "In *Whelan*, [this court] adopted a hearsay exception allowing the substantive use of prior written inconsistent statements, signed by the declarant, who has personal knowledge of the facts stated, when the declarant testifies at trial and is subject to cross-examination. This rule has also been codified [at] § 8-5 (1) of the Connecticut Code of Evidence, which incorporates all of the developments and clarifications of the *Whelan* rule that have occurred since *Whelan* was decided." (Internal quotation marks omitted.) *State* v. *Gray*, 342 Conn. 657, 686, 271 A.3d 101 (2022).

[12] Thus, we respectfully disagree with the dissent's blanket statement that "[t]here was *no physical evidence* connecting the defendant to the crimes." (Emphasis added.) Part III of the dissenting opinion. The dissent, however, concedes that the police recovered a ski mask and gloves—plainly items of physical evidence—from the defendant's home but seeks to diminish the importance of this evidence because, in the dissent's view, ski masks and gloves are commonly found items in many homes located in the northeastern United States. See id. The presence of the mask and gloves is nevertheless of greater significance in light of the other evidence showing that the robbers wore ski masks and that the defendant's cell phone was in the vicinity of the Pay Rite at the time of the shooting. Moreover, the defendant's statement to Hoover about his concern that the police might find his DNA on the mask and gloves would be an odd thing say if he was not concerned that the police would be able to link the mask and gloves to those worn by the perpetrators. Finally, the jury was free to compare the mask and gloves recovered from the defendant's closet to the mask and gloves worn by the perpetrators in the surveillance video for similarities that would render them more probative evidence.

[13] Additionally, upon a search of Sumler's residence pursuant to a warrant, the police discovered grey sweatpants, black gloves, a black mask, nine millimeter bullets, and .38 caliber bullets. Jill Therriault, a firearms examiner, testified that three .38 caliber bullets and one .25 caliber bullet were recovered from the crime scene. All three .38 caliber bullets were fired from the same gun.

[14] As we noted previously; see text accompanying footnote 4 of this opinion; and as the dissent emphasizes in great detail; see part II of the dissenting opinion; the police retrieved other potentially incriminating evidence from the defendant's cell phone, as well, including a text message purportedly from his mother not to come home during the execution of the search warrant and Internet searches for news stories about the Pay Rite robbery. Nevertheless, the defendant's harmless error arguments are focused exclusively on the impact of the unsent text message. Although we focus on the case as argued by the defendant, which relies nearly entirely on the unsent text message element, we emphasize that the inclusion of the other items found in the data on the defendant's cell phone does not change our conclusion that the strength of the state's case renders the assumed constitutional violation harmless beyond a reasonable doubt. See, e.g., *State* v. *Stephenson*, 337 Conn. 643, 653, 255 A.3d 865 (2020) (describing how parties customarily raise and argue claims in adversarial system).

[15] Specifically, during her initial closing argument, the prosecutor reviewed the evidence that the state had presented. The prosecutor spent the first quarter of her closing argument focused on Vanderberg's testimony. Then, the prosecutor reviewed the testimony of Gavilanes, the police officers who responded to the crime scene, and the associate medical examiner who examined the victim's body. The prosecutor emphasized the contents of the video recording of Samuels' original statement to the police and then reviewed Hoover's testimony. Only then did the prosecutor mention the cell phone's contents and, even then, referred specifically to the unsent, draft text message only briefly. Instead, the prosecutor proceeded to emphasize Wines' testimony and the cell site location data.

Specifically, with respect to the contents of the defendant's cell phone, the prosecutor argued: "In the series of text messages that [was] presented, there's a text message that was received by the defendant's [cell] phone at 3:55 a.m. on April 15, 2015, that says, '[d]o not come here.' There was also testimony that, later that day, the same day, April 15, 2015, the defendant and his mother went to the New Haven Police Department to talk to detectives about why they were at . . . his house. In the same string of text

messages, there's a text message that . . . was not sent, although [there was testimony establishing that] there were numerous reasons why a text message may not be sent. Maybe [the cell phone] lost contact with the server, but there's a text message that was typed on the defendant's phone, '[i]f I get locked up tell sheema put them shits in the river some where [worda loc].' "

[16] During his closing argument, defense counsel asserted that it was Vanderberg and not the defendant who had robbed the Pay Rite and shot the clerk. Defense counsel's closing argument contained an exhaustive attack on Vanderberg's credibility, focusing on the fact that he was involved in another robbery and shooting in Bridgeport soon after the Pay Rite robbery and that both crimes shared many similarities, like two suspects wearing ski masks, robbing a convenience store, and shooting the clerk. Thus, counsel argued that the defendant was not involved in the Pay Rite robbery at all and that Vanderberg falsely accused the defendant in an attempt to create a credible defense that Vanderberg did not know that he had used his wife's car to act as a getaway driver for deadly convenience store robberies in Bridgeport and New Haven.

[17] The prosecutor specifically argued in rebuttal: "And what were those texts? When he got the first one right around the time the police are actually tossing his house, from someone to [the defendant], '[d]o not come here.' Later that day, a text that we know was never sent, but it was drafted on that phone, '[i]f I get locked up tell sheema put them shits in the river some where [worda loc].' Shits can mean anything, right? People are constantly throwing stuff in the river. Does that make sense, or does it make more sense that he keeps his gun at his girlfriend's house? He knows he's going to get locked up for this offense, and he's desperately trying to get the word out to get rid of those guns. . . . How about the conversation with Sheema? They're talking about the text message. She had met with [the inspector from the state's attorney's office] a couple [of] days earlier. Of course, she hasn't seen [the defendant] in over [one] year, but she decides to go and pay him a visit days before she gets on the stand. And he says, '[t]hat don't mean nothing. You never got it. That don't mean nothing.' He's not worried at all. What's he referring to? Is he referring to the guns? Is he referring to the text message? I don't know. It certainly shows knowledge of something though, doesn't it?"